UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MAXXIM MEDICAL, INC.,
and MEDLINE INDUSTRIES,
INC.,

    Appellants/Cross-Appellees,

v.                                   CASE NO. 8:10-CV-2577-T-17

PROFESSIONAL HOSPITAL
SUPPLY, INC., and KAREN
McCAULEY,

    Appellees/Cross-Appellants.
_____/

PROFESSIONAL HOSPITAL SUPPLY,
INC., and KAREN McCAULEY,

    Appellants,

vs.                                 CASE NO. 8:10-CV-2688-T-17

MAXXIM MEDICAL, INC. and MEDLINE
INDUSTRIES, INC.,

    Appellees.

## ORDER

This cause is before the Court on:

    Dkt. 1    Bankruptcy Record
    Dkt. 2    Bankruptcy Record
    Dkt. 3    Bankruptcy Record
    Dkt. 4    Bankruptcy Record
    Dkt. 5    Bankruptcy Record
    Dkt. 6    Bankruptcy Record
    Dkt. 7    Bankruptcy Record

Case No. 8:10-CV-2577-T-17
Case No. 8:10-CV-2688-T-17

> Dkt. 8    Bankruptcy Record
> Dkt. 9    Bankruptcy Record
> Dkts.     S-1 - S-4
> Dkt. 12   Appellants' Brief (Maxxim and Medline)
> Dkt. 22   Appellees' Brief in Response and Opening Brief of Cross-Appellants (PHS and McCauley)
> Dkt. 25   Bankruptcy Record
> Dkt. 26   Appellants' Reply Brief and Response to Cross-Appeal (Maxxim and Medline)
> Dkt. 31   Cross-Appellants' Reply Brief in Support of Cross-Appeal (PHS and McCauley)
> Dkt. 35   Appellants' Reply Brief (PHS and McCauley)(Consolidated Appeal)
>
> Dkt. 1    Bankruptcy Record
> Dkt. 2    Bankruptcy Record
> Dkt. 3    Bankruptcy Record
> Dkt. 4    Bankruptcy Record
> Dkt. 5    Bankruptcy Record
> Dkt. 6    Bankruptcy Record
> Dkt. 7    Bankruptcy Record
> Dkt. 8    Bankruptcy Record
> Dkt. 9    Bankruptcy Record
> Dkt. 10   Bankruptcy Record
> Dkts.     S-1 - S-4
> Dkt. 14   Appellants' Brief (PHS and McCauley)
> Dkt. 17   Appellee's Brief (Maxxim and Medline)

In Case No. 8:10-CV-2577-T-17, Appellants Maxxim Medical, Inc. ("Maxxim") and Medline Industries, Inc. ("Medline") have appealed the Findings of Fact and Conclusions of Law and Final Judgment entered in Bankruptcy Court on March 31, 2010, and the Order Denying Plaintiffs' Motion to Amend Findings and Judgment dated June 25, 2010.

Appellees Professional Hospital Supply, Inc. ("PHS") and Karen McCauley ("McCauley") have cross-appealed the Findings of Fact and Conclusions of Law and Final Judgment entered in Bankruptcy Court on March 31, 2010, and the Order Denying Plaintiff's Motion to Amend Findings and Judgment dated June 25, 2010.

2

Case No. 8:10-CV-2577-T-17
Case No. 8:10-CV-2688-T-17

Case No. 8:10-CV-2688-T-17 was consolidated with Case No. 8:10-CV-2577-T-17 for all purposes. (Dkt. 34).

In Case No. 8:10-CV-2688-T-17, Appellants Professional Hospital Supply, Inc. and Karen McCauley appeal the Order on Defendants' Motion for an Award of Costs and Fees entered in Bankruptcy Court on August 19, 2010.

I. Background

Maxxim Medical Group, Inc. filed a Chapter 11 petition in the United States Bankruptcy Court for the Middle District of Delaware on February 11, 2003. Maxxim commenced an adversary proceeding, Case No. 03-10438-PJW, by filing an Adversary Complaint for Injunctive Relief and for Damages against Professional Hospital Supply, Inc. and Karen McCauley. The Complaint included the following claims:

| | | |
|---|---|---|
| Count I: | Breach of Contract | Karen McCauley |
| Count II: | Breach of Contract | Karen McCauley |
| Count III: | Breach of Fiduciary Duty | Karen McCauley |
| Count IV: | Aiding and Abetting Breach Of Fiduciary Duty | PHS |
| Count V: | Tortious Interference with Contract And Advantageous Business Relations | Both Defendants |
| Count VI: | Violation of Uniform Trade Secrets Act | Both Defendants |
| Count VII: | Unfair Competition | Both Defendants |
| Count VIII: | Declaratory Judgment of Violation of Sec. 362(a)(3) | PHS |

In Counts I, II, III, IV, V,VII, and VIII, Maxxim sought compensatory damages in an amount to be determined at trial, and an injunction. In Count VI, Maxxim sought the award of an amount by which PHS and McCauley had been unjustly enriched. In Count VIII, Maxxim also sought the award of attorney's fees and costs.

3

Medline moved to intervene in the Adversary Proceeding as a creditor. Medline was one of the purchasers of the assets of Maxxim in October, 2003. After a hearing, the Bankruptcy Court granted Medline's Motion to Intervene on March 15, 2004.

The Adversary Proceeding was scheduled to go to trial in Delaware in 2004. However, the parties filed numerous motions, among them a Motion to Transfer the case to the Middle District of Florida, which was granted.

After disposition of summary judgment motions, the Bankruptcy Court for the Middle District of Florida conducted a twenty-six day trial of this case, over a period of six months (10/17/2005-3/20/2006) (Findings of Fact, note 2), generating a trial transcript of 5,000 pages, +/-, not including the voluminous trial exhibits and other documents designated by the parties.

The Bankruptcy Court entered Findings of Fact and Conclusions of Law, and a Final Judgment in favor of PHS and McCauley, on March 31, 2010. Maxxim and Medline moved to amend the Findings and Judgment on 4/13/2010, which was denied. PHS and McCauley filed a Bill of Costs and a Motion for the Award of Costs and Fees as prevailing parties. The Bankruptcy Court conducted a hearing on the Motion for the Award of Costs and Fees on 7/19/2010, and entered an Order granting the Motion for Award of Costs and Fees on 8/19/2010, in which the Bankruptcy Court granted the award of certain costs, but denied the award of attorney's fees. This appeal followed.

II. Standard of Review

The Court reviews the factual findings of the Bankruptcy Court for clear error, and the resolution of legal questions de novo. A factual finding is clearly erroneous when, although there is evidence to support it, "the reviewing court is left with the

Case No. 8:10-CV-2577-T-17
Case No. 8:10-CV-2688-T-17

definite and firm conviction that a mistake has been committed." Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1230 (11th Cir. 2009).

Denial of injunctive relief is reviewed under the "abuse of discretion" standard. Kidder, Peabody & Co. v. Brandt, 131 F.3d 1001, 1003 (11th Cir. 1997). Determinations of law made in reaching the decision to deny the injunctive relief are reviewed de novo. Id., at 1003. Under the abuse of discretion standard, a court is allowed a range of choice in reaching its decision and the decision shall be affirmed unless the court "applied the wrong law, followed the wrong procedure, relied on clearly erroneous facts, or committed a clear error in judgment." United States v. Brown, 15 F.3d 1257, 1264-65 (11th Cir. 2005).

III. The Findings of Fact and Conclusions of Law of the Bankruptcy Court

The Bankruptcy Court included detailed Findings of Fact, identifying the parties, and explaining: 1) McCauley's sales representative agreement ("SRA") with Maxxim; 2) McCauley's employment by Maxxim; 3) Custom Procedure Trays ("CPTs"); 4) how CPTs are designed and constructed; 5) bill of materials ("BOMs"); 6) how sales representatives and hospital customers use BOMs; 7) Maxxim's CTMS system; 8) Maxxim's CAD/CAM software; 9) Maxxim's GPO agreement with Novation; and 10) the various causes of Maxxim's loss of Maine business.

In the Conclusions of Law, the Bankruptcy Court included conclusions of law as to jurisdiction, the overall issue of causation, each individual count of the Adversary Complaint, and as to Maxxim's and Medline's request for injunctive relief. The Bankruptcy Court concluded that Maxxim suffered no damages as a result of McCauley's actions, the loss of Maine business was due to other factors and was not caused by PHS or McCauley. The Bankruptcy Court denied Maxxim's and Medline's

5

Case No. 8:10-CV-2577-T-17
Case No. 8:10-CV-2688-T-17

request for injunctive relief. The Bankruptcy Court entered a separate final judgment in favor of PHS and McCauley.

A) Restrictive Provisions of SRA

The SRA includes the following provisions:

11. <u>Covenant Not to Compete</u>. The Representative acknowledges and recognizes the highly competitive nature of the Company's business and that such business constitutes a substantial asset to the Company having been developed through considerable time, money and effort. Accordingly, the Representative agrees to the following: The Representative shall not, during the term of this Agreement or any renewal thereof, or for the period of one (1) year after the expiration or termination of this Agreement (the "Restricted Period"), for any reason, individually or with others, directly or indirectly, (i) engage in a Competing Business within the Territory, including but not limited to the Rendering of services to any Competitive Business within the Territory for any person or entity other than the Company; (ii) have any interest in, directly or indirectly, any corporation, partnership, joint venture, trust or other business entity, or enter into a service agreement with, or the employ of, or act as agent or independent contractor to, any other person, firm, corporation or other entity engaged in a Competitive Business within the Territory; or (iii) recruit, solicit or otherwise influence any employment (sic) or agent of the Company to discontinue such employment or agency relationship with the Company. Notwithstanding the foregoing, the Representative may accept employment with a Competing Business after the termination or expiration of this Agreement is (sic) such Competing Business is diversified and which is, as to that part of its business in which the Representative accepts employment, not a Competing Business; provided however, that prior to the Representative's employment with a Competing Business, the Representative shall deliver to the Company separate written assurances satisfactory to the Company from such Competing Business and from the Representative that the Representative will not render services directly or indirectly, in connection with any Competing Product. This provision shall survive the earlier termination or expiration of this Agreement for a period of one (1) year.

12. <u>Ownership of Customers and Accounts</u>. The Representative acknowledges that, as a result of the Company's efforts and reputation, the Company has developed, and has a substantial relationship with, a substantial base of existing and potential customers, (the "Customer Base") throughout the state of Maine. The Representative acknowledges that the Customer Base is the sole and exclusive property of the Company and that all title to client records and information is and shall remain the sole property of the Company. The Representative shall not access the Customer Base except to fulfill the purposes, terms and provisions of this Agreement. The Representative acknowledges and confirms to the Company that any customer with whom the Representative communicates in any way during the term of this Agreement shall be deemed part of the Company's Customer Base, and that upon termination or expiration of this Agreement, shall not solicit, induce or influence any customer in the Customer Base at any time during the Restricted Period to discontinue or reduce the extent of such relationship with the Company, or to conduct business, directly or indirectly, with the Representative or any corporation, partnership, joint venture, trust, or other business entity with which the Representative may be affiliated.

13. <u>Non Disclosure of Information</u>. The Company acknowledges that the Company's trade secrets, procedures, methods and ideas, market research data or analyses, marketing plans, customer lists and information concerning the Company's products, services, training methods, development, technical information, marketing activities and procedures, and corporate strategies, credit, insurance and other data concerning the Company's Customer Base, as it exists from time to time (the "Proprietary Information") are valuable, special and unique assets of the Company, access to and knowledge of which are essential for the performance of the Representative's duties as an independent contractor of the Company. In light of the highly competitive nature of the industry in which the Company's business is conducted, the Representative agrees that all Proprietary Information shall be considered confidential and shall not be disclosed by him to anyone outside the Company without the Company's permission, except as required by applicable law, and in such case, upon prior notice to the Company so that the Company may take the appropriate measures to protect such information. Upon termination or expiration of his independent contractor relationship with the Company; (i) the Representative agrees to return promptly all documents (including,

Case No. 8:10-CV-2577-T-17
Case No. 8:10-CV-2688-T-17

without limitation, identical or non-identical copies of such documents and documents stored upon electronic media or other means) in his possession which contain Proprietary Information; and (ii) the Representative shall not retain any copies or reproductions of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents relating in any way to the affairs of the Company or the affairs of its affiliated companies and which are entrusted to the Representative at any time during the term or any renewal term of this Agreement. This provision shall survive the earlier termination or expiration of this Agreement.

B) Causation

As to the issue of causation, the Court notes the following testimony of some of Maxxim's former CPT customers. Maxxim had other CPT customers within the State of Maine. In terms of the amount of sales revenue, Maine Medical Center, Penobscot Bay Medical Center, Central Maine Healthcare and St. Joseph's Hospital - Bangor were significant customers.

Thomas Guare is the director of materials management for Maine Medical Center; he is also the director of supply chain management for Maine Health, the parent of Maine Medical Center. Sanford Whitney is the director of materials management for Penobscot Bay Medical Center. Steven Gauthier is the regional director of material services for Central Maine Healthcare. Derrill Maynard is the director of materials management for St. Joseph Hospital - Bangor.

All references are to the volume number and page number(s) of trial transcript.

1) Maine Medical Center - Thomas Guare

Q. Well, you do know that Medline was one of the approved Novation CPT suppliers starting January 1, 2003, do you not?

A. Yes, I do. (11:66).

....

Q. And you don't recall him coming to see you and Mike Gobealle in February 2003 with a possibility of switching business to Medline for CPTs?

A. I do not recall that although Medline at that point was a player and they're on the Novation contract for CPTs and were not eliminated then–by that point.

Q. Well, they were never–they never received–Medline never received an RFP you testified.

A. That's correct. But there was a decision made by the clinical staff to not accept Medline as a vendor. That was the first step in our process was to take the vendors to the clinical staff. (11:66-67).

Q. I'm just asking for what you did, all right, not for what others did. Now, with respect to the visit by Keith White, can you recall discussing with Keith White from Medline the fact that you had already decided to award the contract to Allegiance/Cardinal?

A. I don't recall that conversation nor had I decided to award to award this to Cardinal.

Q. Uh-huh. And did you tell Keith White at this meeting that Maine Medical had in fact struck an arrangement to get discounts for other products, including pharmaceuticals?

A. Maine Medical Center did not do that, Maine Health did.

Q. So that refreshes your recollection that you discussed that with Maine–

A. I don't remember discussing this with Medline. But that–just to be correct, that is not an arrangement for Maine Medical Center, that contract that is being referred to here. That agreement is at a Maine Health level.

Q. Of which Maine Medical is a participant?

9

A. That's correct.

Q. So that deal with Allegiance that was struck was for Maine Health but Maine Medical also reaped some of the benefits from that; is that correct?

A. There was an incentive in an agreement we had with Cardinal so that if we did business with other parts of Cardinal besides the one that we were doing business with which was pharmacy distribution and fixes, there was an incentive or a rebate, an incentive to do business with more of the Cardinal organization. And that is in that agreement.

Q. That is what agreement?

A. That is an agreement Maine Health has with Cardinal. (11:66-67).

....

Q. Okay. So back in February, 2003, it is true that this arrangement had been struck with Maine Health; is that correct?

A. That's correct. (11:67).

....

Q. And those–so you had eliminated Maxxim and you had eliminated Medline, Cardinal/Allegiance and all the other people that had been approved by Novation for CPTs starting January 1, 2003, correct?

A. Correct. (11:79).

....

Q. So your testimony is that you had a hallway conversation with Karen McCauley about the fact that you were thinking of switching from Maxxim to some other CPT supplier in December, 2002?

A. I did not have--that I was thinking of switching. I had a conversation with Karen McCauley that said Maxxim would no longer be part of the next RFP process and award because they were not part of Novation. (11:119).

....

10

Q. You told her that, in essence, if she stayed with Novation (sic), she was not going to be getting any more sales on CPTs--I'm sorry, that if she stayed with Maxxim, she was not going to get any more CPT sales after the runoff.

A. All I said to her was that Maxxim was not a vendor in the next go around on CPTs at Maine Medical Center.

Q. What was her answer?

A. She understood that. She said that we had been pretty faithful to Novation.

Q. Did you discuss with her PHS at that time? (11:120)

A. No.

Q. When was the first time that you and she discussed Professional Hospital Supply, PHS?

A. I don't recall that date that we–but it was on our–we were interested in finding out about PHS as a vendor, who they were. I don't recall when I had the first conversation with Karen McCauley about PHS. (11:121).

....

Q. She knew that when she was gathering the data for Maine Medical CPTs she was gathering it for use to switch off to PHS.

A. She was–no. She was gathering it to see if PHS was a viable vendor for us. (11:122)

....

Q. And one reason you selected PHS was because you knew that Karen McCauley was going to be their account representative; is that correct?

A. That certainly helped. The reasons we picked PHS was at the end of our process they were the best business deal and they met our specifications. Having a good representative was also very important to us. (11:123-124).

11

Case No. 8:10-CV-2577-T-17
Case No. 8:10-CV-2688-T-17

....

Q. You stated that to your recollection the RFP process started in May or June 2003?

A. The process started in Feb–March of 2003. And it's a process that we use where we meet with the clinical staff and start the process and say, "Here's the Novation contract, here are the vendors," and we move forward. (11:141).

....

Q. Okay. And when was the first time that you personally participated in this process?

A. When I--

Q. In the selection process.

A. When I told Karen McCauley that Maxxim was out in December, I would say is the first time I participated. (11:142).

2) Penobscot Bay Medical Center - Sanford Whitney

Q. ....There came a point when Penobscot Bay decided to cease purchasing CPT's from Maxxim. Can you identify for me every reason that you became aware of as chairman of the surgical procedures committee for that decision.
....

A. There are several reasons. The most important reason that we elected to change was quality, and that decision upon quality was reached before this contract ended. The problems were so numerous and so chronic that the surgical products committee came to the conclusion that we were going to change vendors at the end of the VHA contract.

Another factor playing into this was the general business health of Maxxim as a company. We knew that they were in trouble. If fact, we had received a letter talking about Maxxim going into Chapter 11, and there was a lot of concern about their ability to provide product.

12

The last reason--the major reason for the change happened was that Maxxim did not receive an award on the new VHA contract, and we have a commitment to using VHA contracts wherever possible. The volume related to the surgical pack business was considerable for a community hospital like ourselves. It represented probably anywhere from 160 to 170,000 dollars a year. A lot of the products within those packs have rebates associated with them and are contracted products with VHA.

So it was--the fact that Maxxim didn't receive a contract award from VHA for that business in the future was the final reason. But even if they had received an award, we wouldn't have continued with Maxxim because of the quality. (15:99-100).

....

Q. Did Karen McCauley influence your decision to cease purchasing CPT's from Maxxim? (15:103-104).

A. No.

....

Q. As you sit here today, can you recall whether anybody whom you believe to be acting on behalf of Professional Hospital Supply, PHS, influenced your decision to cease purchasing CPT's from Maxxim?

A. No.

Q. Did Karen McCauley ever disparage any Maxxim products?

A. No.

Q. Do you recall her ever disparaging Maxxim generally?

A. No.

Q. Now, eventually Penobscot Bay decided to purchase CPT's from PHS?

A. That's correct.

Q. Can you describe the process that led to that decision?

13

A. We sent in an invitation to three of the awardees of the VHA contract to participate in submitting proposals and samples for our review. The three companies that we invited to participate was Professional Hospital Products, MedLine, and DeRoyal. We provided those companies with a bill of materials, and we also made available samples for their review. I, also, provided contact with my sterile processing manager at the time, Nancy Alewood. She was a former surgical scrub, so she had a very strong working knowledge of how these kits were assembled and the manner in which they were assembled. So she knew the rationale behind these kits and how they were designed.

Then we brought in all three companies. We met with all three representatives; and then as a group we went through, and we went through each one of the samples of the kits from the companies to review if they were assembled correctly, if they had the right products in there, and if they would meet our standards and that; and following a price review, we made a decision to go with Professional Health Systems.

Q. Professional Hospital Supply?

A. Hospital Supply?

Q. Why did you not select MedLine?

A. MedLine--

....

Q. Let me ask it this way. What role did you play in the process?

A. I participated in the committee. I chaired the committee. I worked with the purchasing department and the clinicians to coordinate the logistics around getting not only the proposals together but, also, making sure that we had a smooth handoff here from--transition from using Maxxim products and ensuring that there was enough inventory there and assuring that we got through this process because the unique thing about this book of business is that from the time that you make the decision to the time that you're able to actually have delivery of the product can go out more than two months. And so it's a real balancing act to make sure that the supply chain doesn't get–has product available to do surgical procedures. So I played a role in monitoring that and making sure that happened.

Q. Why did the committee not select MedLine?

....

A. They went through the components of MedLine. They found that the components did not meet 100 percent of their preferences, and they, also, based their decision and, perhaps, most importantly, they based their decision on the cost? MedLine--actually, MedLine was the highest of the three. DeRoyal was actually the second lowest, and then PHS was the lowest. (15:104-106).

3). Central Maine Healthcare - Steven Gauthier

Q. Did there come a time when you learned that Novation had identified new suppliers for the supply of CPT's?

A. Yes.

Q. Do you recall when you learned that approximately?

A. Towards the end of 2002.

Q. All right. And what was your reaction when you heard that announcement?

A. Well, our reaction was at that point to consider focusing on the new Novation suppliers.

Q. Why was that?

A. We want to participate in the group purchasing organization for two reasons: One, we hope we get better pricing as part of an aggregation of other hospitals; and two, we also get a dividend back from Novation during the year for our–based on our participation in their contracts. So we want to stick with–we want to stick with the Novation vendors if at all possible. We want to participate in that.

Q. Now, after Novation made its announcement, did Karen McCauley approach you to discuss the possibility of Maxxim providing CPTs to Central Maine after the expiration of Maxxim's contract with Novation?

A. She did.

Q. And what did she say and what did you say?

A. She offered to sign us for—she actually offered us I think it was a one or two or three year re-up or re-sign up with Maxxim. And obviously one of the things that she offered us, based on our comments, was some sort of reduction in the price or rebate to make up for the share back that we get from Novation by participating in their contracts. In a sense, she tried to make us whole financially by staying with Maxxim.

Q. Did you eventually enter into a contract with Maxxim for the supply of CPTs after the Novation announcement?

A. We did.

Q. What was the term of the contract?

A. We entered into a one-year extension of our agreement with Maxxim.

Q. What was the purpose of entering into a one-year extension?

A. Primarily at that time we were not in a position to change procedure trays because we were in the process of building a cardiac hospital attached to the Central Maine Medical Center facility. And based on the enormous amount of workload and chaos that it created, we didn't want to add another factor, namely changing custom procedure trays, so we opted to sign with them for another year.

Q. And when you opted to sign for another year, what was your then intention as to what you would do at the expiration of that year?

A. At the end of that term, we made it pretty clear we were going to be looking for the Novation suppliers. We were going to be rebating it to Novation suppliers and moving that business elsewhere.

Q. Did you convey that information to anybody?

A. Yes. We conveyed it to Karen.

Q. Did there come a time during 2003 when Central Maine in fact did engage in an RFP process for the supply of custom procedure trays?

A. Yes, there was a time during 2003 when we did that.

Q. And can you tell me approximately when that was?

A. June. May/June timeframe. Mid year.

Q. And who was invited to participate in the RFP?

A. We invited three suppliers: Cardinal, DeRoyal and PHS.

Q. Did you invite Maxxim?

A. No.

Q. Why not?

A. They weren't Novation suppliers, number one, and number two, their quality had really–it wouldn't have mattered if they were. Their quality had really fallen off during the year.

Q. Can you describe what you mean by that?

A. Maxxim began substituting different items in the pack rather than the items we were accustomed to. They also had some quality problems. We found hair in some of the packs or in one or two of the packs. There were punctures in the table covers, punctures in the outer packaging. There were quality issues. (23:20-23).

....

Q. And what was your reaction to those quality issues?

A. Well, they were very disruptive to the process of providing patient care, so our reaction was obviously that we complained, we sought out credits for the trays that had failed and our reaction, you know, it sort of solidified the fact that we weren't going to be looking at them any further.

Q. And you made that determination sometime during the summer of 2003?

....

A. We did. We made the determination, the final determination, based on the quality, by the summer of 2003, that's correct. Before the RFP

17